## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CORLE BUILDING SYSTEMS, INC.,        )
                                     )
      Plaintiff,                    )
                                     )
v.                                   )     Civil No. 3:21-cv-00104-SLH
                                     )     Judge Stephanie L. Haines
OGDEN WELDING SYSTEMS, INC.,         )
                                     )
      Defendant.                    )

## OPINION

Plaintiff Corle Building Systems, Inc. ("Corle") commenced this action on June 10, 2021, filing a four-count Complaint against Defendant Ogden Welding Systems, Inc. ("Ogden"). ECF No. 1. Corle's Complaint was ultimately amended on October 6, 2022. ECF No. 29. Corle alleges the following counts against Ogden: fraudulent inducement (Count I), breach of contract (Count II), breach of implied warranty of fitness for a particular purpose (Count III), and breach of implied warranty of merchantability (Count IV). *Id.* In its prayer for relief, Corle also requests punitive damages. *Id.* at p. 55. Pending before the Court is Ogden's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 30. In a Memorandum in Support of its Motion to Dismiss, Ogden requests the Court dismiss Count I[1] of Corle's Amended Complaint under the gist of the action doctrine or, alternatively, "because the allegations of misrepresentation are premised upon future predictions and acts, opinions, and puffery." ECF No. 31. Corle filed a Brief in Opposition to Ogden's Motion to Dismiss Count I of the Amended Complaint and Ogden filed a Reply Brief. ECF Nos. 33, 34. This matter is fully briefed and ripe for disposition.

---

[1] Although Ogden's Motion to Dismiss would more accurately be referred to as a Partial Motion to Dismiss because it seeks to dismiss only one count of the Amended Complaint, the Court will refer to it as a Motion to Dismiss for continuity with the pleadings.

For the reasons set forth below, the Court will GRANT in part and DENY in part Ogden's Motion to Dismiss Count I of the Amended Complaint.

## I.      Factual Background

In 2019, Corle, a pre-engineered metal building manufacturer, contacted Ogden, a manufacturer of automated welding machines, to inquire whether Ogden would be able to propose machinery which would improve Corle's fabrication of steel beams later used in the construction of metal buildings. ECF No. 29 at ¶¶ 5, 13, 21, 22. In April 2019, Jeffery Darnell ("Mr. Darnell"), President of Ogden, visited Corle's facility and thereafter began communicating with Frank Kmetz ("Mr. Kmetz"), Vice-President of Corle, regarding proposals to improve Corle's welding operations. *Id.* at ¶¶ 23, 25.

Mr. Darnell proposed utilizing Integrated Cold Electrode (ICE) welding technology and components manufactured by third-party ESAB, who was not a party of the transaction between Corle and Ogden. *Id.* at ¶¶ 25-26, 39. After learning that Corle needed equipment which could weld steel between 9 gauge and up to over 1" thick, Mr. Darnell represented that the proposed equipment "would be capable of effectively welding steel ranging from 9 gauge up to over 1" thick." *Id.* at ¶¶ 26, 28-32. Corle later reiterated the necessity of processing the described range of steel and expressed a hesitancy to continue negotiation until the agreed upon tests were completed and confirmation of the machines' ability was received. *Id.* at 34-36. Mr. Darnell confirmed this representation, explaining that Ogden had done a test weld with the last machine, successfully completing a "1" single pass with a prepared edge[,]" and that ESAB "successfully welded 9 gauge ... using the proposed welding equipment." *Id.* at ¶¶ 32, 37. Moving forward, Mr. Kmetz and Mr. Darnell discussed a number of revised proposals throughout August and early September, which included the specification that the Web Welder's run-off tabs would be no more

than 3" to 4". *Id.* at ¶ 90. After this series of proposals, Mr. Kmetz emailed Mr. Darnell on September 6, 2019, requesting the price when ordering five machines at the same time. *Id.* at ¶¶ 42-43. Within 10 days, the Parties finalized the purchase price, payment schedule, and delivery schedule. On September 13, 2019, Corle ordered five welding machines for $1,375,000, and Ogden issued a Purchase Order. *Id.* at ¶¶ 42-47.

In addition to scheduling payment and delivery, the Purchase Order identified numerous specifications regarding the welding machines which include, among other things, the following:

1) The Flange Welder machine would "be capable of performing welds on plate sections with lengths up to 18", plus lead-in and run-off tabs" and would successfully weld a minimum thickness of 1⁄4" up to 3⁄4" although a "thicker weld may be welded with edge prep or multiple pass procedures." ECF No. 29-1, at p. 9.

2) The Web Welder machine would "be capable of performing welds on plate sections with lengths up to 72", plus lead-in and run-off tabs and would successfully weld a minimum thickness of 9 gauge and a maximum of 3⁄4", although "thicker may be welded with edge prep or multiple pass procedure." ECF No. 29-1, at p. 19.

While Ogden was unable to meet the delivery timeline set forth in the Purchase Order, Corle paid Ogden $1,237,500, 90% of the full contract price, prior to the delivery of any machines to Corle's facility. ECF No. 29 at ¶¶ 102, 109. By early March 2020, the first two machines had been delivered and installed at Corle's facility, but Corle alleges that it began experiencing immediate difficulties with their function. *Id.* at ¶¶ 110-111. These difficulties included:

(1) The Flange Welder was not operational due to the improper feeding of wire, insufficient space because of the oversized run off tabs, and overall improper welds resulting from the wires arcing, burning, or otherwise malfunctioning. *Id.* at ¶ 112.

(2) The Web Welder functioned poorly due to inadequate wire delivery system which resulted in "improper and/or inconsistent welds and welding operations[,]" too much power that caused it to burn "through the metal and/or weld and le[ft] holes in the weld or very uneven welds that need[ed] to be reworked[,]" and a faulty flux delivery system that did not put down the correct amount of flux. *Id.* at ¶ 113.

After a long process of trying to rectify the issues and because Corle was not satisfied with the machinery for the reasons listed above, it revoked acceptance of the two delivered welding machines, rejected delivery of the remaining three welding machines, and demanded an immediate refund of payment in addition to compensation for the damages it incurred. *Id.* at ¶¶ 118-119, 144-146. Ogden did not refund Corle its payments or compensate it for any damages that may have occurred. *Id.* at ¶ 147. Therefore, Corle brought suit.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed, in whole or in part, for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). In this way, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide

4

"more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal citations omitted).

At the motion to dismiss stage, the court does not address whether the plaintiff will be able to prove the facts alleged or will ultimately prevail on the merits, but instead determines if the claimant is entitled to offer evidence to support the claims. *Id.* at 563 n.8; *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000). As such, the court must accept as true all well-pled factual allegations in the complaint and its attachments and view all reasonable inferences in the light most favorable to the plaintiff(s). *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997). However, the court is not required to accept inferences that are unsupported by factual allegations in the complaint or legal conclusions disguised as factual allegations. *See Twombly*, 550 U.S. at 555; *California Pub. Emp. Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

When determining the sufficiency of a complaint under the standards establish in *Twombly* and *Iqbal*, a court must: (1) "tak[e] note of the elements [the] plaintiff must plead to state a claim," *Iqbal*, 556 U.S. at 675, (2) identify allegations unsupported by facts that, "because they are no more than conclusions, are not entitled to the assumption of truth," *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011), and (3) assume the veracity of well-pleaded factual allegations and proceed to "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. In short, a motion to dismiss should not be granted if a plaintiff alleges facts, which taken as true, would entitle him/her to relief. *See Iqbal*, 281 F.3d at 678; *see generally Twombly*, 550 U.S. at 570.

**III.     Analysis**

While Corle alleges four counts against Ogden in its Amended Complaint (ECF No. 29), Ogden has only moved to dismiss Count I, fraudulent inducement, of Corle's Amended Complaint. ECF No. 30.  Corle alleges Count I against Ogden based upon the following four representations: (1) Ogden represented to Corle "that its welding machines would be capable of welding 9 gauge steel" (ECF No. 29 at ¶ 169); (2) Ogden represented to Corle "that ESAB had successfully tested welding 9 gauge steel on a comparable welding machine to what Ogden was proposing to supply to Corle" (*id.* at ¶ 170); (3) Ogden represented to Corle "prior to issuance of the Purchase Order that its welding machines would fit in the allotted space and would provide the functionality needed by Corle" (*id.* at ¶172); and (4) Ogden represented to Corle "that its welding machines would only require 3" to 4" run off tabs" (*id.* at ¶ 175).

Ogden contends that Count I is barred by the gist of the action doctrine because it "is duplicative and inseparable from [Corle's] claim for breach of contract [and] premised upon the written contract with [Ogden]." ECF No. 30 at ¶ 1.  Alternatively, Ogden contends that Count I should be "dismissed because the allegations of misrepresentation are premised upon future predictions and acts, opinions, and puffery, which cannot support a count for fraud." *Id.* at ¶ 2.

### A.  Applicable Law

As a threshold matter, Ogden has raised a choice of law issue in its Motion to Dismiss.  ECF No. 31 at p. 3.  While "the parties dispute which law applies," Indiana law or Pennsylvania law, Ogden contends that "said choice of law issue has no effect on ... [its] Motion [to Dismiss], because both Pennsylvania and Indiana law are in accord that Corle has failed to set forth a claim for Count I of fraudulent inducement."  ECF No. 31 at p. 3, n. 2.  Ogden first raised the choice of law issue in its Motion for Transfer of Venue Pursuant to 28 U.S.C. § 1404 (ECF No. 6 at ¶ 3) which, previously, Ogden agreed to withdraw (ECF No. 23), and the Court withdrew (ECF No. 24).  Even

after the Parties met and conferred to clean up the docket, Ogden maintained that "the issue of governing law (Pennsylvania or Indiana) remains," and reserved "all rights on the issue of choice of law that arose as part of its Motion for Transfer of Venue." ECF No. 23 at p. 2.

The choice of law provision reads: "the rights and obligations arising hereunder shall be governed by the laws and courts of Lake County Indiana in the U.S.A." ECF. No 6 at p. 6. This dispute does not involve the language of the choice of law provision. Instead, Ogden argues that the choice of law agreement is a part of "additional terms and conditions of the written contract entered into between Corle and Ogden" (ECF No. 6 at p. 1) incorporated by reference in the proposals. ECF No. 31 at p.3. Corle counters that the choice of law provision was not a part of the contract as the choice of law provision may be found in the "Domestic Terms and Conditions for Retrofits Revision 0 2[,]" (ECF No. 29 at ¶ 55) and that document (1) was not referenced by that title anywhere in the Proposals (ECF No. 29 at ¶ 61), (2) was "never attached to any of the Proposals sent by Ogden to Corle[,]" (ECF No. 29 at ¶ 56), and (3) was never seen "nor received or reviewed [by Corle] ... until they were included for the first time in a Motion filed by Ogden in the present Action." *Id.*

When interpreting the terms of a choice of law provision, the same fundamental rule applies as when interpreting the meaning of a contract -- ascertain the intent of the parties through the language specifically chosen and give effect to that intention. *See Murphy v. Duquesne University of the Holy Ghost*, 565 Pa. 571, 591 (Pa. 2001). Therefore, choice of law provisions "are interpreted pursuant to their sensible grammatical construction." *Broederdorf v. Bachler*, 129 F.Supp.3d 182, 191 (E.D. Pa. 2015). "Unless the fair import of the [choice of law] provision embraces all aspects of the legal relationship[,]" encompassing non-contractual claims as well, such provisions "do not govern tort claims between contracting parties." *Jiffy Lube Intern., Inc. v.*

*Jiffy Lube of Pennsylvania, Inc.* 848 F.Supp. 569, 576 (E.D. Pa. 1994); *see McDonald v. Wells Fargo Bank, N.A.*, 374 F.Supp.3d 462, 478 (W.D. Pa. 2019).   Therefore, narrow choice of law provisions that "relate only to the construction and interpretation of the contract at issue," *Id.* (quoting *Grimm v. Discover Fin. Servs.*, No. 08-747, 2008 WL 4821695, at \*7 (W.D. Pa. Nov. 4, 2008)), do not apply to the gist of the action doctrine, which Ogden raised in its Motion to Dismiss (ECF No. 30), as the doctrine is "a creature of tort as opposed to contract law." *U.S Claims, Inc. v. Saffren & Weinberg, LLP.*, No. 07-0543, 2007 WL 4225536, at \*8 n. 8( E.D. Pa. Nov. 29, 2007); *see Tier1 Innovation LLC v. Expert Technology Group, LP*, No. 06-cv-04622, 2007 WL 1377664, at \*2 n. 1 (E.D. Pa. May 8, 2007); *Owen J. Roberts Sch. Dist. v. HTE, Inc.*, No. 02-7830, 2003 WL 735098, at \*3 n. 4 (E.D. Pa. Feb. 28, 2003).

Should the choice of law provision be valid, Indiana law would apply to all rights and obligations which arise under the terms of the contract.   In this way, the disputed choice of law question is narrow in scope and relates only to the construction and interpretation of the contract rather than broadly encompassing non-contractual claims as well.   *See Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F.Supp.2d 589, 593 (E.D. Pa 1999).   Therefore, the choice of law provision, whether valid or otherwise, is inapplicable to the Court's instant evaluation of Corle's tort claim, Count I of the Amended Complaint (ECF No. 29), and the applicability of the gist of the action doctrine raised by Ogden in its Motion to Dismiss (ECF. No. 30).   *Id.*

As the choice of law provision is inapplicable, this Court sitting in diversity must apply the forum state's choice of law rules.   *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Melmark, Inc. v. Schutt by and Through Schutt*, 651 Pa. 714, 726 (Pa. 2019); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007).   Under Pennsylvania's choice of law rules, courts must first consider whether a conflict exists between the two states before beginning a choice of

law analysis. *See Melmark*, 651 Pa. at 726. If there appears to be a conflict, an examination must be undertaken to determine if the conflict actually exists and is therefore "true." *Id.* In some instances, the conflict only exists facially in that, after a deeper analysis, the laws of both states would produce the same results but "one of the states has no meaningful policy-based interest in the issue raised[,]" rendering the conflict "false". *Id.* If however, there is no conflict, no further choice of law analysis is necessary, *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, 693 F.3d 417, 432 (3d Cir. 2012), and the laws of the forum state apply. *See Commonwealth v. Eichinger*, 591 Pa. 1, 20 (Pa. 2007) (finding no conflict between the New Jersey and Pennsylvania law in question and applying Pennsylvania law after holding that "any interest New Jersey might have in th[e] transaction is rendered moot by that lack of conflict"); *State Farm Fire and Cas. Co. v. Holmes Products*, 165 Fed.Appx. 182, 185 n.1 (3d Cir. 2006) ("[B]ecause there is no conflict between the laws of other states that may have an interest in the current action ... [this] court shall apply the law of the forum state."); *Broederdorf*, 129 F.Supp.3d at 195 ("[T]here is no conflict and so we apply the law of the forum state, Pennsylvania.").

Here, Corle alleges a fraudulent inducement claim and Ogden raises both gist of the action in addition to a sufficiency of the pleading argument in support of its Motion to Dismiss. ECF No. 30. As neither issue presents any apparent conflict between Indiana and Pennsylvania law, a further examination is unnecessary.[2] Thus, the law of the forum state, Pennsylvania, will be applied in the foregoing analysis.

---

[2] The elements of fraudulent inducement under Indiana law are functionally identical to those under Pennsylvania law. *Compare Tru-Cal, Inc. v. Conrad Kacsik Instrument Systems, Inc.*, 905 N.E.2d 40, 44-45 (Ind. Ct. Appl. 2009) (holding that the elements of fraudulent inducement are: "(1) a material representation of past or existing facts which (2) was false, (3) was made with knowledge or reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) proximately caused injury to the complaining party.") *with Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) ("The elements of fraud in the inducement are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was

**B.  Gist of the Action Doctrine**

"Arising out of the concern that tort recovery should not be permitted for contractual breaches[,]" *Addie v. Kjaer*, 737 F.3d 854, 865 (3d Cir. 2013), "the [gist of the action] doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (2002).  At its core, the Pennsylvania gist of the action doctrine prevents "plaintiffs from recasting ordinary breach of contract claims into tort claims."  *Id.*; *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 591 (W.D. Pa. 2019).

Because the Pennsylvania Supreme Court had not directly addressed the gist of the action doctrine until 2014, Pennsylvania state and federal courts were historically divided as to whether the doctrine applied to fraudulent inducement claims.  *Compare Mirizio v. Joseph*, 4 A.3d 1073, 1085 (Pa. Super. Ct. 2010) ("While the gist of the action doctrine may bar a tort claim arising from the performance of a contract it does not bar a fraud claim stemming from the fraudulent inducement to enter into a contract"); *with Williams v. Hilton Group PLC*, 93 Fed.Appx. 384, 386-87 (3d Cir. 2004) (holding that the gist of the action doctrine barred plaintiff's fraudulent inducement claim as the gist of the claim sounded in contract).  However, the Pennsylvania Supreme Court explained in *Bruno v. Erie Ins. Co.*, that there is no categorical carve out based upon the plaintiff's mere labeling of a claim; instead, a court is to examine the allegations

---

proximately caused by the reliance."). Additionally, although Indiana has not officially adopted the gist of the action doctrine by name, it has incorporated principles into its law which would produce the same outcome here as the principles of Pennsylvania law carried under the banner of the gist of the action doctrine. *E.g., compare Forest River Manufacturing, LLC v. Lexmark Enterprise Software, LLC*, No. 3:16-CV-449 JD, 2017 1906164 (N.D. Ind. May 9, 2017) ("Indiana does not recognize a tort claim for breach of contract, nor does it allow parties to circumvent that rule by repackaging a breach of contract as a tort." (citing *Greg Allen Const. Co., Inc. v. Estelle*, 798 N.E.2d 171, 173 (Ind. 2003)) *with eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (2002) ("As a practical matter, the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims.").

comprising a claim and determine the origin of the duty by identifying whether the duty is subsumed by the terms of the contract. *Bruno*, 630 Pa. 79, 111-112 (Pa. 2014).

In determining the gist of the action, "the mere existence of a contract between two parties does not *ipso facto*, classify a claim ... as one for breach of contract." *Id.* at 114. Instead, "the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract" is "the nature of the duty alleged to have been breached." *Id.* at 111-12. This distinction overlooks the mere labeling of a claim as one of tort or of contract and examines the substance of the allegations comprising that particular claim in order to determine whether the duty is imposed by law as a matter of social policy or by mutual consensus agreements between parties to a contract. *See Id.*; *Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710, 718 (Pa. Super. 2005).

Since the duty-based demarcation discussed in *Bruno* is the "touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint[,]" a tort claim founded on the breach of the specific executory promises which comprise the underlying contract would be subsumed by a coinciding breach of contract claim. *Bruno*, 630 Pa. at 113-14. However, if a tort claim is alleged based upon actions of a contracting party not governed by contractual obligations, the claim is not viewed as an action based upon the underlying contract itself because the contract was merely a mechanism which established the relationship between the parties during which a tort was committed. *See id.* at 114. This narrow distinction exists, in essence, between claims which are premised upon the terms of the contract, arising from a contractual duty, and those which are premised instead upon the defendant's conduct outside the terms of the contract, arising from a broader social duty enforced by the law. *Id.* at 112-13. In other words, the gist of the action doctrine provides that "an alleged tort claim against a party to a

contract, based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations." *Earl v. NVR, Inc.*, 990 F.3d 310, 315 (3d Cir. 2021) (quoting *Bruno*, 630 Pa. at 87).

The *Bruno* Court likened the duty-based demarcation to the "inextricably intertwined" standard expressed in *eToll* and explained that such a demarcation should be viewed "as a determination of whether the nature of the duty upon which the breach of contract claims rest is the same as that which forms the basis of the tort claims." *Bruno*, 630 Pa. at n.17. In *eToll*, the court recognized that there is no categorical exception to the gist of the action doctrine for fraud and held that "the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties." *eToll*, 811 A.2d at 19. This linchpin is more readily identified when the fraud alleged is labeled as fraud in the performance. However, while claims of fraudulent inducement are "much more *likely* to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists," *Sullivan*, 873 A.2d at 719 (emphasis added) (internal citations omitted), fraudulent inducement claims may likewise concern the performance of contractual duties when the representations upon which the fraudulent inducement claim rests were later incorporated into the specific executory promises of the contract. *See Downs v. Andrews*, 639 Fed.Appx. 816, 820 (3d Cir. 2016) (recognizing, in light of *Bruno*, that "where the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract, the claim may be dismissed under the gist of the action doctrine." (citing *Wen v. Willis*, 117 F.Supp.3d. 673, 681 (E.D. Pa. 2015)).

In the case at hand, Corle alleges that the following four representations made by Ogden prior to contracting constitute fraudulent inducement: (1) Ogden represented to Corle "that its welding

machines would be capable of welding 9-gauge steel" ("Representation 1") (ECF No. 29 at ¶ 169); (2) Ogden represented to Corle "that ESAB had successfully tested welding 9 gauge steel on a comparable welding machine to what Ogden was proposing to supply to Corle" ("Representation 2") (*id.* at ¶ 170); (3) Ogden represented to Corle "prior to issuance of the Purchase Order that its welding machines would fit in the allotted space and would provide the functionality needed by Corle" ("Representation 3") (*id.* at ¶172); and (4) Ogden represented to Corle "that its welding machines would only require 3" to 4" run off tabs ("Representation 4") (*id.* at ¶ 175). Because Corle has alleged multiple representations in support of its fraudulent inducement claim, the Court will analyze each representation separately to determine if any duty established is born out of contractual provisions or a broader duty to society.

Regarding Representation 1, the Purchase Order provides that the Flange Welder machine would be able to weld steel 1⁄4" up to 3⁄4" thick (ECF No. 29-1, at p. 9) and that the Web Welder machine would be able to weld steel with a minimum thickness of 9 gauge and a maximum of 3⁄4". ECF No. 29-1, at p. 19. Because the representation that the "welding machines would be capable of welding 9-gauge steel" was later incorporated into specific executory promises of the contract, this representation does not support Corle's claim of fraudulent inducement as a result of the gist of the action doctrine. Instead, this representation is subsumed by the contract through the duties enumerated therein and thus resounds in contract law. *See e.g.*, *Bruno*, 106 A.3d at 68-70; *Down*, 639 Fed.Appx. at 820; *Wen*, 117 F.Supp.3d. at 681.

Regarding Representation 2, the Purchase Order contained no specific executory promise concerning Ogden's representation that ESAB had completed a successful test weld of 9 gauge material on a comparable machine. As such, any duty which may have been violated considering this representation was a product, not of contract but, of a broader societal duty. Thus, this

representation does not resound in contract law and may support Corle's fraudulent inducement claim if Corle has sufficiently provided adequate factual support for pleading fraudulent inducement. This analysis will be undertaken below.

Regarding Representation 3, while the functionality of the machines is explicitly covered under the terms of the contract, there is no specific executory promise in the contract involving the machine's size. Regardless, both elements of this representation are implicitly provided for in the contract through the implied warranty of fitness for a particular purpose, which also provides the basis for Count III of Corle's Complaint. Under 13 Pa. C.S.A. § 2315, "where the seller at the time of contracting has reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods; there is ... an implied warranty that the goods shall be fit for such purpose."[3]

Here, Corle is alleging that Ogden knew the particular space constraints, the particular functionality requirements, and that Corle was relying upon Ogden's skill and judgment to furnish suitable welding equipment. Therefore, despite its label, this representation effectively pleads breach of the implied warranty of fitness for a particular purpose. *See generally Gall by Gall v. Allegheny County Health Dept.*, 521 Pa. 68, 75 (Pa. 1989); *Allen-Myland, Inc. v. Garmin Intern., Inc.*, 140 A.3d 677, 683 (Pa. Super. Ct. 2016) (quoting *Altronics of Bethlehem Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992)). Because this representation is outlined through both the explicit and implicit terms of the contract, this representation does not support Corle's claim of fraudulent inducement because of the gist of the action doctrine. Instead, because the underlying

---

[3] Indiana's statutory implied warranty of fitness for a particular purpose is nearly identical. Indiana Code § 26-1-2-135 provides "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods there is ... an implied warranty that the goods shall be fit for such purpose." Thus, under either state's law, the substance of this representation is a breach of an implied warranty of a contract rather than a tort claim.

duty was subsumed by the contract through specific executory promises that are both explicit and implicit; this representation and accompanying allegation resounds in contract law. *See e.g.*, *Bruno*, 106 A.3d at 68-70; *Down*, 639 Fed.Appx. at 820; *Wen*, 117 F.Supp.3d. at 681.

Regarding Representation 4, no specific executory promise was incorporated into the Purchase Order Corle attached to its Amended Complaint (ECF No. 29-1) which involved Ogden's representation that the welding machines would only require run off tabs of 3" to 4". As such, any duty which may have been violated considering this representation is, at this stage in litigation, a product, not of a contract but, of a broader societal duty. Thus, this representation does not resound in contract law but may support Corle's fraudulent inducement claim if Corle sufficiently provides adequate factual support for pleading fraudulent inducement. This analysis will likewise be undertaken below.

Thus, the gist of the action doctrine would bar Count I of Corle's Amended Complaint if Representations 1 and 3 were the only factual support proffered for the claim of fraudulent inducement because both are inextricably intertwined with the contract to the extent that the contract later outlines those specific duties. However, Representations 2 and 4 are unaffected by the gist of the action doctrine as they are not inextricably intertwined with the contract but, rather, collateral to the duties established therein. As such, Representations 2 and 4 may support Corle's fraudulent inducement claim if they provide adequate factual support for pleading fraudulent inducement. This analysis will be undertaken below.

### C. Sufficiency of the Pleading

"Fraud in the inducement induces a party to assent to something he otherwise would not have[,]" *MZM Construction Company, Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 405 (3d Cir. 2020) (citing *Connors v. Fawn Min. Corp.*, 30 F.3d 481, 490 (3d

Cir. 1994)), and "occurs when someone signs the document they intended to sign, but their assent was induced by a material misrepresentation about facts external to that document." *Id.* (citing *Sandvik AB v. Advent Intern. Corp.*, 220 F.3d 99, 109 (3d Cir. 2000); 37 Am. Jur. 2d Fraud and Deceit § 2 (2020)).  To survive the motion to dismiss, plaintiff must plead sufficient factual content to plausibly satisfy the elements of the claim and allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "The elements of fraud in the inducement are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (internal quotation marks and citations omitted); *see Bortz v. Noon*, 556 Pa. 489, 499 (Pa. 1999); *EBC, Inc. v. Clark Bldg. Systems, Inc.*, 618 F.3d 253, 275 (3d Cir. 2010).

### (1) Representation

Corle pled in its Amended Complaint that, in the course of communicating with Mr. Darnell, Mr. Darnell informed Corle that "I have just heard back from ESAB, they have successfully welded 9 gauge (5/32"), using the proposed welding equipment at 70 IPM."  ECF No. 29 at ¶ 37. Additionally, Corle contends that although a dimension for the run-off tabs was not provided in Proposal No. 8694 Rev 01 or the purchase order, Mr. Darnell "expressly represented to Corle's representatives that the run-off tabs would be no more than 3" to 4"." *Id.* at ¶ 84.  Taking Corle's factual averments as true, each of the above constitute a representation.

### (2) Materiality

While "one deceived need not prove that fraudulent misrepresentation was the sole inducement to the investment of money," the inducement must be material. *Eigen*, 874 A.2d at 1186 (quoting *Silverman v. Bell Sav. & Loan Asso.*, 533 A.2d 110, 113 (Pa. Super. Ct. 1987)). "A misrepresentation is material when it is of such a character that if it had not been made, the transaction would not have been entered into." *In re Passarelli Family Trust*, 663 Pa. 456, 478 (Pa. 2020) (quoting *De Joseph v. Zambelli*, 139 A.2d 644, 647 (Pa. 1958)).

Corle contends that it informed Ogden that any machinery "would need to effectively weld plate steel ranging from 9 gauge up to over 1" thick." ECF No. 29 at ¶ 29. The necessity of this range was indicated by Corle when Mr. Kmetz emailed Mr. Darnell and stated that Corle would "wait to hear the results of the 9 gauge [test agreed to by Ogden] before ... scheduling a trip" to see another of Ogden's welding machines which utilized similar technology. *Id.* at ¶ 36. Because Corle expressed an aversion to continued pursuance of the proposed machines without confirmation of their ability to weld 9 gauge steel, it demonstrated that without a representation as to the machines' capability, the transaction would not be entered. In this way, under the motion to dismiss standard of review, Corle has sufficiently pled the materiality of Representation 2.

Conversely, Corle conclusively states, without accompanying factual allegations, that it would not have continued negotiating with Ogden or issued the Purchase Order if it had known that "the run off tabs would need to be well over 3" to 4" and could not be removed easily." ECF No. 29 at ¶ 181. There are no further factual allegations that would suggest the size of the run-off tabs themselves were material to Corle aside from the need for the machines to fit in the allotted space at Corle's facility. As such, it cannot be determined whether a representation specifically detailing the size of the run off tabs was material in the sense that Corle would not have entered the

transaction but for its specific issuance.  Thus, the materiality regarding Representation 4 is, at best, in question because it is not supported by factual allegations.

### (3) Falsity

In a fraudulent inducement claim, the representation must be "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false." *Eigen*, 874 A.2d at 1185.  At the motion to dismiss stage, the falsity of this representation must be sufficiently pled through raising factual allegations in support.

Corle alleges that, at the time Mr. Darnell represented ESAB had successfully welded 9-gauge steel, ESAB had not conducted any such test according to ESAB workers.  ECF No. 29 at ¶ 133.  In pleading that, according to ESAB's own representatives, "ESAB had never tested 9 gauge steel to see if it could achieve a proper weld using the ESAB welding components sized by Ogden for the welding machines" and that "ESAB was never able to get 9 gauge steel to pass standard acceptance criteria for welds[,]" Corle has sufficiently pled through factual allegations that any representation made by Mr. Darnell to the contrary was necessarily and knowingly false as ESAB would have provided no confirmation.  Thus, under the motion to dismiss standard of review, Corle has sufficiently pled falsity regarding Representation 2.

"A statement as to future plans or intentions is not fraudulent under Pennsylvania law unless it knowingly misstates the speaker's true state of mind when made." *Harrison v. Cabot Oil and Gas Corp.*, 887 F.Supp.2d 588, 592 (M.D. Pa. 2012) (quoting *Nat'l Data Payment Sys. Inc. v. Meridian Bank*, 212 F.3d 849, 858 (3d Cir. 2000)).  Corle appears to be relying upon outcome rather than a false representation of Ogden's intention in pleading that Representation 4 was false.  Corle does not allege a knowing misrepresentation at the time it was made but instead states "Ogden's representation that its welding machines would only require 3" to 4" run off tabs was false since

the welding machines actually require run off tabs that are approximately 16" by 8" and are very difficult to remove." ECF No. 19 at ¶ 176. As this representation relates to a future plan or intention and Corle has not raised factual allegations which plead that said representation knowingly misstated Ogden's true state of mind at the time it was made, Corle failed to sufficiently plead falsity regarding Representation 4.

### (4) Intent

"To succeed on a claim of fraudulent inducement, the complaining party must show intent to mislead." *Eigen*, 874 A.2d at 1187. Regarding Representation 2, Corle has sufficiently pled that Ogden intended to mislead when, allegedly, it falsely represented that ESAB had successfully welded 9-gauge steel, only after Corle made clear its importance to the contract as a whole. Thus, Corle has pled that Ogden intended to mislead Corle into thinking that confirmation had been received from ESAB so that Corle would continue negotiation. Though inferred and circumstantial, this element is supported by factual allegations.

The element of intent is closely related to the element of falsity in that it would be difficult for a party to intentionally mislead another if the representation is not made with knowledge of its falsity or recklessness in regard to whether it is true or false. Corle neither sufficiently pled that Ogden knew Representation 4 was false at the time it was made or was reckless in regard to whether it was true or false, nor did Corle sufficiently plead Representation 4 was made with the intention to mislead as no factual allegations were proffered in support.

### (5) Justifiable Reliance

"To be justifiable, reliance upon the representation of another must be reasonable." *Porreco v. Porreco*, 571 Pa. 61, 69 (Pa. 2002) (citing *In re Allegheny International, Inc.*, 954 F.2d 167, 178 (3d Cir. 1992)). Whether reliance is justified depends upon whether the recipient knew or should

have known that the information supplied was false. *Id.* at 70 (citing *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 460 (E.D. Pa. 1994)).  For this reason, "where the means of obtaining the information" in question are not equal, "the positive representations of the person who is supposed to possess superior means of information may be relied on." *Siskin v. Cohen*, 363 Pa. 580, 584 (Pa. 1950) (quoting *Emery v. Third Nat. Bank of Pittsburgh*, 314 Pa. 544, 548 (Pa. 1934)).

Regarding Representations 2 and 4, Corle has sufficiently pled that reliance was justifiable. Corle explains that Ogden was consulted as an expert in welding equipment manufacturing and that Ogden had utilized ESAB components in its machines even prior to the transaction at hand. ECF No. 29 at ¶¶ 21, 31, 32.  Given the business relationship between Ogden and ESAB as well as the lack thereof between Corle and ESAB, Ogden possessed superior means of obtaining information regarding test welds on 9-gauge steel by ESAB utilizing the welding components in question.  Additionally, since Ogden was the entity designing the automated welding equipment, it possessed a superior means of obtaining information regarding the measurements of the proposed run-off tabs. Thus, Corle has sufficiently pled justified reliance regarding both Representation 2 and 4.

### (6) Proximate Cause and Damages

"A party claiming fraud in the inducement must demonstrate that the fraud proximately caused economic harm." *Eigen*, 874 A.2d at 1190. In addition to the payment of 90% of the contract price, Corle has sufficiently pled that both representations proximately caused economic harm.  Among numerous other damages regarding the representation that the machines would be able to weld 9-gauge steel, including entering the contract in the first place, Corle asserts that it has "incurred significant increased expense using oversized material as a result of ... [the machines'] inability to

weld 9 gauge material such that it has eliminated the use of 9 gauge material in its design of metal buildings." ECF No. 29 at ¶ 162. Additionally, Corle asserts that it had to devote a significant amount of extra time to remove the larger than expected run-off tabs which further delayed use of the machines in production. ECF No. 29 at ¶ 122. As such, Corle sufficiently pled factual allegations that both Representation 2 and 4 proximately caused economic harm.

Although Corle did not sufficiently plead all six elements of fraudulent inducement regarding Representation 4, that the run-off tabs would be 3" to 4", Corle sufficiently pled all six elements regarding Representation 2, that ESAB had successfully welded 9-gauge steel utilizing a similar machine. Thus, the Court will GRANT in part and DENY in part Defendant's Motion to Dismiss Count I.

**IV.    Conclusion**

Because Representations 1 and 3 were subsumed by the specific executory promises of the contract and thus barred from supporting a fraudulent inducement claim by the gist of the action doctrine, the Court finds permitting further amendment of these claims would be futile and therefore will DISMISS these claims WITH PREJUDICE, *see Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004), GRANTING in part Ogden's Motion to Dismiss (ECF No. 30). Because Corle failed to sufficiently plead each element of fraudulent inducement regarding Representation 4, the Court is not convinced that an amendment would be inequitable or futile and will DISMISS this claim WITHOUT PREJUDICE, *see Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008), GRANTING in part Ogden's Motion to Dismiss (ECF No. 30). Because Corle sufficiently pled Representation 2 to state a claim that is plausible on its face and allows the Court to draw the reasonable inference that the Defendant, Ogden, is liable for the misconduct alleged, the Court will DENY Ogden's Motion to Dismiss Count I (ECF No. 30) in all other respects.

An appropriate Order follows.

Date: July 26, 2023

Stephanie L. Haines
United States District Judge